UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

JERRY WASHINGTON,

        Plaintiff,

MICHIGAN DEPARTMENT OF     Civil Action No. 10-12233
COMMUNITY HEALTH,           Honorable Paul D. Borman
                          Magistrate Judge Elizabeth A. Stafford

        Intervenor,

v.

EDDIE JAMES JENKINS, M.D.,

        Defendant.

_____/

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [114]

## I.   INTRODUCTION

Plaintiff Jerry Washington's ("Washington") First Amended Complaint

alleges that Defendant Eddie Jenkins, M.D. ("Jenkins"), an Internist, was

deliberately indifferent to his serious medical needs, which resulted in his

right leg being amputated below the knee.[1] [94].  This case was referred to

the undersigned to resolve all pretrial matters pursuant to 28 U.S.C. §

_____

[1] The Michigan Department of Community Health filed an intervenor
complaint alleging that it is subrogated to any right of recovery that
Washington may have for the cost of medical services it provided through
the Medicaid program in connection with the alleged injury.  [91].

636(b)(1)(A) and (B).  [123].  Before the Court is Jenkins' motion for summary judgment.  [114].

For the following reasons, the Court **RECOMMENDS** that Jenkins' motion for summary judgment [114] be **GRANTED**.

## II.   BACKGROUND

### A.   Washington's Relevant Medical History and Medical Care from April 2, 2007 through June 7, 2007

Washington was sentenced to prison in the mid-1970s, and he remained in the custody of the Michigan Department of Corrections ("MDOC") through July 2007, when he was paroled.  In early 2005, Washington, a diabetic, complained of pain and cramping in his feet and legs.  Washington was diagnosed with peripheral vascular  disease ("PVD") in his lower extremities and subsequently received a femoral-popliteal bypass graft to reduce blockage and increase blood flow to his feet and legs.

This action is based on incidents that occurred from April to July 2007.  At that time, Washington was 54 years old.  On April 2, 2007, Kenya Everette, M.D. ("Dr. Everette") – Washington's MDOC-assigned Medical Service Provider ("MSP") – examined Washington and noted that his peripheral pulses in his lower extremities were "normal," but that he had PVD and uncontrolled diabetes.  Shortly thereafter, Washington began

experiencing pain in his right foot and lower leg.  He submitted several

"kites" (i.e., a medical request form) regarding his concerns and had

multiple interactions with Dr. Everette and other medical personnel, as

illustrated by the following timeline:

- April 13, 2007 – Washington submitted a kite asking to see Dr. Everette because "[his] diabetes sugar [was] out of control" and "[his] feet and toes [were] hurting and turning black on the end…."  Debra Richardson, R.N., reviewed the kite and informed Washington he should receive an appointment to see a MSP within two weeks.

- April 24, 2007 – Washington submitted a second kite complaining that his legs were cramping up.  The reviewing nurse, Christine Stewart, R.N., scheduled him to be seen on April 26, 2007.

- April 26, 2007 – Washington submitted a third kite stating that: (1) he could not "walk any distance, because [he] ha[d] no circulation in [his] legs"; (2) his toes were black and feet were cold; and (3) he needs another operation for PVD.  Later that day, Nurse Stewart examined Washington and observed that his "right toes [were] cold to touch[,]" but that he had "good pedal pulses"; she scheduled a follow-up with a MSP for April 30, 2007.

- May 1, 2007 – Dr. Everette examined Washington, who complained of throbbing pain in his right lower extremity that was like "frostbite" and "walking on nerves."  He said the pain intensified when walking, and that when resting, although diminished, the pain was still at a level of 3-4 out of 10.  Dr. Everette sent Washington to Foote Hospital for an "urgent venous study."  Doppler studies were completed which showed blockage of Washington's right femoral-popliteal bypass graft.

- May 2, 2007 – The treating physician at Foote Hospital recommended a follow-up consultation with Joseph V. Cotroneo, M.D. ("Dr. Cotroneo"), a vascular surgeon, and Washington's results were sent to his office.  Dr. Everette submitted an internal request for

3

Washington to have the follow-up consultation.  The request was authorized on May 3, and the follow-up was scheduled for May 18.

- May 18, 2007 – Washington's consultation with Dr. Cotroneo was rescheduled for two weeks later.  Dr. Everette examined Washington and observed the following regarding his right lower extremity: "no pulse palpated, cool to touch, no cyanosis of toes…."  She ordered Washington a wheelchair and lift restrictions.

- May 21, 2007 – Dr. Everette wrote a progress note stating that Washington's right leg was not black in color, cyanotic, or swollen. She also noted that Dr. Cotroneo – who reviewed the Doppler studies – said Washington "has collateral flow around the obstruction and has severe claudication as opposed to being in a limb salvage situation."

- May 24, 2007 – Washington was sent to Duane Waters Hospital after submitting a kite complaining of right foot pain.  The examining physician observed that Washington had severe claudication, but that he had sensation in his right lower extremity and capillary refill. Washington received Vicodin for pain and was returned to his facility.

- May 25, 2007 – Dr. Everette examined Washington and observed that his right foot had no pulse, was cool to touch, and had a "dusky" dorsal surface, but that there was no gangrene or cyanosis.

- May 29, 2007 – Washington saw Dr. Cotroneo.  After the consultation, Dr. Cotroneo sent a letter to Duane Waters Hospital stating, among other things, that Washington: (1) "needs arteriograms as soon as possible to evaluate his circulation in his right leg," after which a decision could be made about surgical intervention; (2) "is clearly going to need some procedure in order to salvage his right leg"; and (3) "has severe ischemia[2] [in his right leg] and if it is not addressed in the near future, he will end up with an amputation." This letter was not part of the MDOC medical chart.

  In addition, Dr. Cotroneo filled out a Specialty Consult Report, with "Urgent" written largely at the top, in which he recommended an arteriogram "ASAP" ("First Form 409 Report").

---

[2] Ischemia means inadequate blood flow.

Dr. Everette reviewed and signed the First Form 409 Report.  She also wrote a progress note stating that Dr. Cotroneo informed her that Washington's right lower extremity was "becoming susceptible to limb ischemia and requir[ed] urgent treatment."  Based on this, Dr. Everette scheduled an emergent arteriogram for June 7.

- June 7, 2007 – Dr. Cotroneo performed the scheduled arteriogram and filled out a "Procedure Note" stating that Washington has "Right superficial femoral artery occlusion, right femoral popliteal graft occlusion, [and] right popliteal artery and trifurcation occlusion."  Dr. Cotroneo recommended a "femoral endarterectomy to open up the profunda and … perhaps an endovascular  attempt to open up something, either his graft or the superficial femoral artery going down into the popliteal" (the "vascular procedure").  Dr. Cotroneo also filled out a Specialty Consult Report stating that Washington needed the vascular procedure, but he left the "TIME FRAME" line blank ("Second Form 409 Report").  Neither the Procedure Note nor the Second Form 409 Report indicated that the vascular procedure needed to be scheduled on an emergent basis.

### B.    Medical Care by Jenkins from June 8, 2007 through July 2, 2007

At the end of May, Dr. Everette was transferred to a different MDOC

facility, and she was no longer responsible for Washington's care.  As a

result, Jenkins became Washington's MSP:

- June 8, 2007 – Jenkins reviewed Dr. Cotroneo's Second Form 409 Report and submitted an internal request for approval of the vascular procedure to be performed within one month of June 8.  Jenkins also ordered Washington Vicodin every four hours, as needed, for 60 days for severe PVD with ischemic pain.

Washington says he met Jenkins on June 8 and that he told Jenkins that Dr. Cotroneo said the vascular procedure should be done as soon as possible.  Washington says Jenkins responded, "I don't know nothing about no surgery, and I'm not doing shit for you."  [119,

5

Exhibit A, Affidavit of Jerry Washington, at ¶ 11].

- June 14, 2007 – Washington complained that his right foot was very painful and blistering. Teresa Thomson, R.N., examined Washington and noted that his toes were swollen and painful to touch, but his foot was normal temperature and color. Jenkins observed the examination, but he did not write any new orders.

- June 15, 2007 – Jenkins examined Washington and noted that he was awaiting surgery for his severe PVD with an occluded right femoral popliteal bypass graft. He observed that Washington's right foot had no pulse, had a small ruptured blister, and was cool to touch. Jenkins also noted that Washington's Vicodin helped with the pain.

- June 20, 2007 – Washington submitted a kite requesting medical treatment on his right leg and foot. Nurse Richardson reviewed the kite on June 21, but no appointment was available that day.

- June 22, 2007 – While conducting a follow-up assessment on Washington's wheelchair status, Linda Tucker, N.P., observed that: (1) he was able to apply minimum weight on his right foot; (2) his right leg was discolored up to his knee; (3) his great toe and right foot were severely black in color; and (4) she was unable to touch his foot.

- June 23, 2007 – Karen Ibarra, R.N., wrote a progress note stating that Washington said he could not get out of his wheelchair or walk and that he wanted to go to the hospital "to have surgery to fix" his leg "now." The following day, Nurse Ibarra noted in a clinical observations form that Washington was able to stand, but he could not put any weight on his right foot.

- June 25, 2007 – Nurse Richardson saw Washington, who complained that his foot was "killing" him. She took photos of his foot and observed that: (1) she could not "palpate pedal [or] post tibial pulses"; (2) Washington "[d]enie[d] sensation to [his right] great toe" and had "pain [in] 2nd-5th toes with decreased sensation to 4th toe"; (3) he had an intact blister on top of his foot; (4) his foot was "warm w[ith] mild edema"; (5) his "2nd toe [was the] only toe [without] black area noted"; and (6) his "3rd and 5th toe [were] 1/3 black, [and his] 4th toe

6

[was] 3/4 black."

- June 26, 2007 – Nurse Richardson saw Washington again and observed that: (1) the blister on the top of his foot was "draining serious fluid"; (2) he had diminished sensation at his great and fourth toes; (3) he had no distal pulses; (4) there was no increase to the black appearance of his toes; and (5) his foot remained warm.

- June 27, 2007 – The request for approval of the vascular procedure, which Jenkins submitted on June 8, was approved. The vascular procedure was scheduled for July 6, 2007.[3]

- June 28, 2007 – Jenkins and Nurse Richardson examined Washington. Nurse Richardson's observations were similar to those from June 25-26. Jenkins observed that there were no distal pulses in his right foot and that each toe on his right foot other than the second toe had gangrenous tips.

### C.   Washington's July 2, 2007 Heart Attack through His August 3, 2007 Amputation

- July 2, 2007 – Washington complained of chest pain and was transported emergently to Foote Hospital, where he was diagnosed with acute inferior posterior wall myocardial infarction (i.e., a heart attack). He remained at Foote Hospital until July 7. Among other things, Washington's medical records from Foote Hospital indicate that his right great toe was gangrenous and his foot was necrotic.

- July 7, 2007 – Washington was transported back to Duane Waters Hospital. His attending physician noted that the vascular procedure was postponed due to his heart attack.

- July 24, 2007 – Washington was released on parole, and he admitted himself to St. Mary's Medical Center in Saginaw.

---

[3] Jenkins' notes mistakenly indicate that the vascular procedure was scheduled for July 8. However, whether the vascular procedure was scheduled for July 6 or July 8 is not a material difference for the purpose of this action.

7

- August 3, 2007 – Washington's right lower extremity was amputated below the knee.

### D.    Relevant Procedural History

Washington brought this action in June 2010 against multiple defendants.  On February 13, 2013, Washington filed a first amended complaint listing Jenkins as the sole defendant and alleging that he was deliberately indifferent to his serious medical needs in violation of his Eight Amendment right to be free from cruel and unusual punishment.  Both Washington and Jenkins retained expert witnesses for this action, and they both rely on expert opinion to support their respective position on summary judgment.

Washington initially designated M. Wayne Flye, M.D. ("Dr. Flye") as his expert witness.  During the pendency of this action, however, Dr. Flye retired and voluntarily surrendered his medical license, and the Court allowed Washington to substitute Dr. Flye with Wayne Gradman, M.D. ("Dr. Gradman"); Dr. Gradman specializes in vascular surgery.  [101].  Jenkins retained two expert witnesses, Paul Bove, M.D. ("Dr. Bove") and John Bonema, M.D. ("Dr. Bonema").  Dr. Bove specializes in vascular surgery; Dr. Bonema, like Jenkins, specializes in internal medicine.

On July 7, 2014, Jenkins filed a motion to strike Dr. Gradman's opinions which conclude that he was deliberately indifferent, callously

8

indifferent, and that he intentionally withheld medical care from
Washington.  [120]. On January 30, 2015, the Court granted Jenkins
motion and struck the opinions at issue from the record, finding that they
were legal conclusions that did nothing more than tell the jury which result
to reach.  [124].  The Court also held that Washington could not rely on
those opinions to oppose summary judgment.

In the First Amended Complaint, Washington alleges that Jenkins
was deliberately indifferent to his serious medical needs by refusing to
heed to continued complaints of his severe pain and continuing to treat his
blocked femoral popliteal bypass graft as routine, rather than scheduling
the vascular procedure emergently.  On May 15, 2014, Jenkins moved for
summary judgment pursuant to Federal Rule of Civil Procedure 56.  [114].
Washington filed a response on June 17, 2014 [119], and Jenkins replied
[122].  This matter is fully briefed.

## III.    LEGAL STANDARDS

### A. Motions for Summary Judgment

Rule 56 provides that "[t]he Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
56(a).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57

9

(1986).  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  A fact is material if it could affect the outcome of the case based on the governing substantive law.  *Liberty Lobby*, 477 U.S. at 248.  A dispute about a material fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

If the movant satisfies its burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing a genuine issue for trial.  *Celotex*, 477 U.S. at 324; *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001).  The opposing party "may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'"  *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).  "Conclusory

10

statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

In deciding a summary judgment motion, the Court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court need only consider the cited materials, but it may consider other evidence in the record. Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## B. Section 1983 Claims

Washington's claim arises under 28 U.S.C. § 1983, which creates a cause of action against any person who, under color of state law, deprives another of a right secured by the Constitution or laws of the United States.

11

*Broyles v. Corr. Med. Services, Inc.*, 478 Fed. Appx. 971, 974 (6th Cir.

2012).  It is well-established that a prison official's "deliberate indifference"

to an inmate's serious medical needs constitutes "unnecessary and wanton

infliction of pain" in violation of the Eight Amendment's prohibition against

cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104

(1976).

A deliberate indifference claim under the Eight Amendment has an

objective and a subjective component.  *Comstock v. McCrary*, 273 F.3d

693, 702 (6th Cir. 2001).  The objective component requires a plaintiff to

allege that the medical need at issue is "sufficiently serious."  *Id.* at 702-03

(quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The subjective

component requires that the prison official had a "sufficiently culpable state

of mind" in denying medical care "rising above negligence or even gross

negligence and being tantamount to intent to punish."  *Broyles*, 478 Fed.

Appx. at 975 (citation and internal quotations omitted).  Specifically, a

plaintiff must "allege facts which, if true, would show that the official being

sued subjectively perceived facts from which to infer substantial risk to the

prisoner, that he did in fact draw the inference, and that he then

disregarded that risk."  *Comstock*, 273 F.3d at 703.  However, a plaintiff

does not have to show that the prison official acted "for the very purpose of

12

causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Rather, a plaintiff need only show that the official "recklessly disregard[ed]" a substantial risk of serious harm. *Id.* at 836.

In evaluating a claim of deliberate indifference, federal courts "distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)). Where medical treatment was provided, and a prisoner claims that it was inadequate, "courts are generally reluctant to second guess medical judgments." *Id.* (citation omitted). It is possible, however, for medical treatment to be "so woefully inadequate as to amount to no treatment at all." *Id.* (citation omitted).

The Supreme Court has explained that "an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838 (emphasis added). However, although a plaintiff's burden to prove a prison official's subjective knowledge is "onerous," it "is subject to proof by 'the usual ways.'" *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 842). Specifically,

13

a reviewing court may "infer from circumstantial evidence that a prison

official had the requisite knowledge," and a prison official cannot escape

liability by "'merely refus[ing] to verify underlying facts that he strongly

suspected to be true, or [by] declin[ing] to confirm inferences of risk that he

strongly suspected to exist.'"  *Id.* (quoting *Farmer*, 511 U.S. at 842-43).

## IV.   ANALYSIS

### A. There Is Insufficient Evidence For a Reasonable Jury to Conclude That Jenkins Was Deliberately Indifferent To Washington's Serious Medical Needs

Jenkins says he is entitled to summary judgment because a

reasonable jury could not conclude that he was deliberately indifferent to

Washington's serious medical needs.  After carefully reviewing the

evidence, the Court agrees.

As an initial matter, Jenkins does not dispute that the objective

component of deliberate indifference is satisfied: Washington's medical

need was sufficiently serious.  He was suffering from severe pain and

limited mobility due to his PVD, and his right leg was ultimately amputated

below the knee.

The central issue in this action concerns the subjective component of

the deliberate indifference inquiry.  The Court must determine whether a

reasonable jury could conclude that Jenkins perceived facts from which he

14

2:10-cv-12233-PDB-EAS   Doc # 125   Filed 02/09/15   Pg 15 of 22   Pg ID 1845

could infer a substantial risk in scheduling Washington's surgery on July 6,

2007, that he in fact drew that inference, and that he disregarded the risk.

*Comstock*, 273, F.3d at 703.  Here, there is insufficient evidence that the

scheduling of the vascular procedure for July 6 posed a substantial risk,

and no evidence that Jenkins perceived such a risk.

Jenkins testified at his deposition that he believed the vascular

procedure would be successful on July 6, 2007:

> [D]uring the time that I cared for [Washington], I did not feel that
> his limb was in jeopardy of being – losing it.  He did on the 25th
> start having some necrotic change, but I felt at that time that he
> had – his foot was warm and he had sensation to all of his toes
> except the great toe.  The distal pulses weren't there from the
> beginning, so that's not really a change.  He had capillary refill
> in the sole of his foot and sensation, so those are items that I
> felt that – viable enough even though he did have some
> elements of gangrene on the tips of his toes that surgery could
> still be carried out on the scheduled date.

[114, Exhibit N, Deposition Testimony of Eddie Jenkins, M.D., at pp. 125-

26].  He also testified that he believed "the necrosis that was present was

more surface level and not involving the entire toe."  [*Id.*, at p. 126].

Jenkins' belief that the vascular procedure would be successful on

the scheduled date is supported by the opinions of three of the four

experts.  Dr. Bove opined that Jenkins provided Washington reasonable

and appropriate medical care at all times, and that Jenkins' decision to

schedule the vascular procedure within one month of the arteriogram was

15

reasonable.  Additionally, Dr. Bove believed that "[t]here were no symptoms exhibited by Plaintiff requiring anyone to suspect that a heart attack [may occur] before Plaintiff's vascular procedure could be completed."  He concluded, "[I]t is more probable than not that … had Plaintiff never experienced a heart attack on July 2, 2007, and had he received his vascular  surgery as scheduled on July 6, 2007, his subsequent right leg amputation below the knee would have been prevented, and the leg saved."  [114, Exhibit D, Rule 26 Expert Report of Paul Bove, M.D., at pp. 9-10].

Similarly, Dr. Bonema believed that Jenkins provided reasonable medical care, that the vascular procedure was scheduled appropriately, and that Washington displayed no symptoms requiring Jenkins to suspect a heart attack was possible.  According to Dr. Bonema, during the time Jenkins cared for Washington, "Plaintiff's medical condition in his lower extremity did not change significant [sic] enough to appreciably change his opportunity for a successful outcome during the vascular  surgery … scheduled to occur on July 6, 2007."  [114, Exhibit E, Rule 26 Expert Report of John Bonema, M.D., at pp. 8-11].

In addition, even Washington's original expert, Dr. Flye, concluded that "as of early July 2007, Mr. Washington's leg amputation was

16

avoidable, and had he received surgery by Dr. Cotroneo … to remove the

occlusion of the femoral-popliteal graft … [at] this time, he would have

avoided the necessity of right lower leg amputation."  [114, Exhibit G,

Affidavit of Dr. Flye, at p. 3].  Washington says Jenkins' "pre-occupation"

with Dr. Flye is "off the mark" because he will not testify at trial.  The Court

disagrees.  Although Dr. Flye's affidavit was originally for a separate

malpractice action against Dr. Cotroneo, Washington incorporated the

affidavit into this action on March 15, 2012.  [67, Exhibit D].  When deciding

a motion for summary judgment, the Court must consider cited materials,

and "it may consider other materials in the record."  Fed. R. Civ. P.

56(c)(3).  Therefore, even had Jenkins not cited to Dr. Flye's affidavit in his

motion, the Court may still consider it in deciding this matter.

Washington's relies on Dr. Cotroeno's May 29 letter,[4] Form 409

Reports and Dr. Everett's notes to argue that Jenkins knew that he should

schedule the vascular procedure more urgently, but those records do not

support Washington's argument.  The doctors repeatedly stressed that

Washington needed an urgent arteriogram and treatment, not that he

needed emergency surgery.  Dr. Cotroeno performed the arteriogram on

---

[4] Jenkins correctly points out that Dr. Cotroeno's May 29 letter was not part
of the MDOC medical chart; it was sent to Duane Waters Hospital.  There
is no evidence that Jenkins reviewed Dr. Cotroeno's letter or was aware of
its contents.

June 7, 2007 and recommended surgery, but he did not indicate that it had to be handled emergently.  The following day, Jenkins requested approval for the surgery to be completed within 30 days.  In the meantime, Washington's right foot was regularly monitored and his pain was treated with narcotic medication.

These records as well as the opinions of Dr. Flye, Dr. Bove, and Dr. Bonema refute Washington's claim that Jenkins perceived facts from which he should have inferred a substantial risk of harm by scheduling the vascular procedure for July 6, and corroborate Jenkins' testimony that he did not, in fact, infer such a risk.  Dr. Gradman's differing opinion may present a question of fact regarding whether Jenkins should have perceived a risk, but not whether Jenkins was deliberately indifferent to a risk that he actually perceived.  "[A]n official's failure to alleviate a significant risk that *he should have perceived but did not . . .* cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838 (emphasis added).

To support a theme that Jenkins acted callously, Washington emphasizes Jenkins' testimony that he did not think that it was "worth even a phone call" to Dr. Cotroneo to determine why the Second Form 409 did not include a time frame for the recommended vascular procedure.

18

Jenkins states that what he meant by that testimony was that he believed

Washington "had some collateral flow to the foot and it was appropriate to

continue to wait for surgery as scheduled."  [114, Exhibit B, Certification of

Dr. Eddie Jenkins, at ¶ 11].  Regardless, the fact that Jenkins did not

perceive a need to call Dr. Cotroneo for clarification cannot be

characterized as deliberate indifference.

Washington further alleges that, on June 8, 2007, Jenkins told him, "I

don't know nothing about no surgery, and I'm not doing shit for you."  Even

if that allegation is true, it does not raise a genuine issue of material fact;

the question before the Court is whether Jenkins ***acted*** with deliberate

indifference, not whether he treated Washington with courtesy.  With regard

to Jenkins' actions, the record shows that he requested approval for the

vascular procedure the same day as the alleged remark, examined

Washington multiple times throughout June and provided him with pain

medication while awaiting surgery.

Contrary to Washington's argument, his case is not comparable to

*Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005).  The *Johnson* plaintiff had

completely severed tendons in his hands shortly before he was transferred

to jail.  The undisputed evidence established "[t]hat it is common medical

knowledge, which should be known to every medical practitioner, that

severed tendons must be repaired in a timely manner, because over time the severed tendons will retract, and may become irreparable." *Id.* at 874-75 (internal citations omitted).  In contrast, three of the four experts who reviewed this case did not believe that it was evident that Washington's vascular procedure should have been scheduled earlier than July 6.

Additionally, during the *Johnson* plaintiff's 31 days in jail, the responsible doctor examined the plaintiff only once and never scheduled surgery; his treatment of the plaintiff was woefully inadequate.  *Id.* at 871-73, 875-76.  In this case, the day after the arteriogram, Jenkins saw Washington and requested approval for the vascular procedure, and Jenkins routinely monitored Washington's condition.  Jenkins' treatment of Washington cannot be described as woefully inadequate.  Where, as here, a prison doctor provided medical treatment that was not "so woefully inadequate as to amount to no treatment at all," the Court is "reluctant to second guess medical judgments."  *Alspaugh*, 643 F.3d at 169 (citation omitted).  The Court will not second guess Jenkins' treatment of Washington*.*

Viewing the evidence in the light most favorable to Washington, the Court finds that a reasonable jury could not conclude that Jenkins was aware that Washington required the vascular procedure sooner than

20

scheduled, and that he then disregarded such knowledge; Jenkins is entitled to summary judgment as a matter of law.

## III.   CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that Jenkins' motion for summary judgment [114] be **GRANTED**.

> s/Elizabeth A. Stafford
> ELIZABETH A. STAFFORD
> United States Magistrate Judge

Dated: February 9, 2015

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"
etc., and **must specify** precisely the provision of this Report and
Recommendation to which it pertains.  Not later than fourteen days after
service of objections, **the non-objecting party must file a response** to
the objections, specifically addressing each issue raised in the objections in
the same order and labeled as "Response to Objection #1," "Response to
Objection #2," etc.  The response must be **concise and proportionate in
length and complexity to the objections**, but there is otherwise no page
limitation.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon counsel of record and any unrepresented parties via the Court's ECF
System to their respective email or First Class U.S. mail addresses
disclosed on the Notice of Electronic Filing on February 9, 2015.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager