UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JERRY WASHINGTON,

        Plaintiff,                                     Case No. 10-cv-12233

MICHIGAN DEPARTMENT OF
COMMUNITY HEALTH                                 Paul D. Borman
                                                     United States District Judge

              Intervenor,

v.                                         Elizabeth A. Stafford
                                                      United States Magistrate Judge

DR. EDDIE JAMES JENKINS,

              Defendant.
_____/

OPINION AND ORDER (1) GRANTING PLAINTIFF'S OBJECTIONS (ECF NO. 126);
(2) REJECTING THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION (ECF NO. 125); AND
(3) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 114)

On February 9, 2015, Magistrate Judge Elizabeth A. Stafford issued a Report and

Recommendation in favor of granting Defendant Dr. Eddie James Jenkins' Motion for Summary

Judgment (ECF No. 114). (ECF No. 125, Report and Recommendation). Plaintiff Jerry

Washington filed a timely Objection to the Report and Recommendation dated February 23,

2015. (ECF No. 126). Thereafter, Defendant filed a Response to Plaintiff's Objection. (ECF

No. 127).

This Court reviews *de novo* the portions of a report and recommendation to which

objections have been filed. 28 U .S.C. § 636(b)(1); Fᴇᴅ. R. Cɪᴠ. P. 72(b). Having conducted a

*de novo* review of the parts of the Magistrate Judge's Report and Recommendation to which

valid objections have been filed pursuant to 28 U.S.C. § 636(b)(1), the Court will reject the

Report and Recommendation, grant Plaintiff's objections, and deny Defendant's motion for

2:10-cv-12233-PDB-EAS   Doc # 128   Filed 09/30/15   Pg 2 of 21   Pg ID 1881

summary judgment.

## I. PERTINENT PROCEDURAL HISTORY

Plaintiff brought this action in June 2010 against a number of defendants. (ECF No. 1). Thereafter, on February 13, 2013, Plaintiff filed an Amended Complaint against only Defendant, setting forth a claim pursuant to 28 U.S.C. § 1983 and alleging Defendant was deliberately indifferent to his serious medical needs in violation of Plaintiff's Eighth Amendment rights.

Plaintiff and Defendant both retained expert witnesses during the pendency of this action.[1] However, after Plaintiff filed his Response to this Motion for Summary Judgment, Defendant filed a Motion to Strike portions of Plaintiff's expert opinion as inadmissible pursuant to Fed. R. Evid. 704. (ECF No. 120). Plaintiff failed to respond to Defendant's Motion to Strike. Thereafter, on January 30, 2015, Magistrate Judge Stafford granted Defendant's Motion to Strike Plaintiff's Expert Opinion and held that Plaintiff could not rely upon Wayne Gradman, M.D.'s expert opinion to the extent that he concluded that: (1) medical care was "intentionally denied" to Plaintiff, (2) Defendant acted "with callous indifference or cruel and unusual punishment", (3) Defendant "needlessly and callously withheld" medical care from Plaintiff; (4) Defendant had a "callous disregard" of Plaintiff; and (5) "displayed callous indifference to Mr. Washington's serious medical condition". (ECF No. 124, at 2). Plaintiff did not object to the Magistrate Judge's order.

_____

[1] The Court notes that Plaintiff was allowed to substitute Wayne Gradman, M.D. as his expert witness in place of his previously designated expert witness, M. Wayne Flye, M.D., after Dr. Flye retired and voluntarily surrendered his medical license. (ECF No. 101, Order granting Motion to Substitute Sole Expert Witness).

2

## II. BACKGROUND

Plaintiff's action is based on incidents that occurred between April 2007 through July 2007.  During that time period, Plaintiff was 54 years old and a prisoner in the custody of the Michigan Department of Corrections.  Plaintiff had previously been diagnosed with peripheral vascular disease ("PVD") in his lower extremities and received a femoral-popliteal bypass graft in 2005.  (Def.'s Mot., Ex. A, Medical Records, 1-7; Pl.'s Resp., Ex. A, Washington Aff. ¶¶ 1-3). Plaintiff had a history of uncontrolled diabetes.  (Medical Records, at 8-15).

In April and through May 2007, Plaintiff's Medical Service Provider ("MSP") was Kenya Everette, M.D., an independent contractor physician with Correctional Medical Services, Inc. ("CMS").[2]  During those months, Plaintiff submitted multiple kites regarding pain he felt in his feet and toes and complained his legs were cramping.  (*Id*. at 8-20).  Eventually, on May 1, 2007, Dr. Everette examined Plaintiff who complained that he had pain similar to "frostbite", felt like he was "walking on nerves", and noted the pain diminished but not completely resolve when he was at rest.  After the exam, Dr. Everette sent Plaintiff to Foote Hospital for an "urgent venous study".  (*Id*., at 21).  An ultrasound was conducted and ruled out a deep venous thrombosis but demonstrated an "occlusion" or blockage of Plaintiff's right femoral-popliteal bypass graft.  (*Id*. at 22).

On May 2, 2007, Dr. Everette submitted an internal request for Plaintiff to receive a follow-up consultation with a vascular surgeon to be performed within one week of May 2, 2007. (*Id*. at 23-24; 31-32).  The request was authorized and scheduled for May 18, 2007 with Joseph

---

[2] CMS was dismissed without prejudice as a defendant from this action by stipulated order on April 14, 2012.  (ECF No. 82, Stipulated Order).

V. Cotroneo, M.D. (*Id*. at 31-32). Plaintiff was ultimately seen by Dr. Cotroneo on May 29, 2007. (*Id*. at 56-57). After the exam, Dr. Cotroneo contemporaneously sent a letter to Duane Waters Hospital that stated Plaintiff needed "arteriograms as soon as possible to evaluate his circulation in his right leg" and "is clearly going to need some procedure in order to salvage his right leg" and "has severe ischemia and if not addressed in the near future he will end up with an amputation". (Pl.'s Ex. C, Cotroneo 5/29/07 Letter and Notes). It is undisputed that this letter did not become part of Plaintiff's MDOC medical record. Dr. Cotroneo also authored a "Form 409" ("First Form 409"), which did become part of the MDOC medical record, on which the word "URGENT" was handwritten largely on the top and in which Dr. Cotroneo requested arteriograms for Plaintiff "ASAP". (Pl.'s Ex. B, at 25). The "TIME FRAME" line on the First Form 409 was left blank. (*Id*.).

That same day, on May 29, 2007, Dr. Everette reviewed and signed the First Form 409 authored by Dr. Cotroneo and noted in her progress notes that she spoke with Dr. Cotroneo who informed her that Plaintiff was "becoming susceptible to limb ischemia and requir[ed] urgent treatment." She then noted that an "emergent arteriogram" would be scheduled. (Medical Records, at 57). Dr. Everette's emergent request for an arteriogram and follow up appointment was partially approved on May 30, 2007 such that the urgent arteriogram was scheduled for June 7, 2007. (*Id*. at 63-64). However, the follow up appointment request was denied "as premature. *Patient may require emergent surgery following arteriogram*– not another [follow up]." (*Id*. at 61) (emphasis added). Dr. Everette also prescribed Plaintiff pain medication at that time. (*Id*. at 62).

4

In early June 2007, Plaintiff's MSP, Dr. Everette, was reassigned to a different correctional facility and was no longer in charge of Plaintiff's care.  (*See* Def.'s Ex. H, Everette Aff.).  At that time, Defendant was assigned to Plaintiff as his primary care physician or MSP.

On June 7, 2007, the Plaintiff's arteriogram was performed by Dr. Cotroneo who set forth in his procedure note that: "Right superficial femoral artery occlusion, right femoral popliteal graft occlusion, right popliteal artery and trifurcation occlusion" and "right profunda stenosis of about 50%".  (Medical Records, at 66).  Dr. Cotroneo recommended "[p]robably a femoral endarterectomy to open up the profunda and at that time, perhaps an endovascular attempt to open up something, either his graft or the superficial femoral artery going down into the popliteal".  (*Id.*).  On that same date, Dr. Cotroneo also filled out a Specialty Consult Form ("Second Form 409") noting that the arteriogram was performed and diagnosing Plaintiff with "Severe PVD [right] leg".  (*Id.* at 70).  In the Second Form 409, Dr. Controneo recommended that Plaintiff receive surgery and vicodin for "rest pain" but left the "TIME FRAME" line on the form blank.  (*Id.*).

Plaintiff claims that he first met with Defendant on June 8, 2007.  At that meeting Plaintiff informed Defendant that Dr. Cotroneo had advised him that he needed the vascular procedure as soon as possible.  (Washington Aff. at ¶ 11).  Defendant claimed he did not remember this meeting but did not deny that this meeting took place.  (Jenkins' Dep. at 48).  Plaintiff alleges that during this first examination, Defendant allegedly told him that "I don't know nothing about no surgery, and I'm not doing shit for you."  (Washington Aff. at ¶ 11).  On that same day, June 8, 2007, Defendant reviewed Dr. Cotroneo's Second Form 409 and submitted an internal request for the surgery to be performed within one month of June 8, 2007

5

rather than urgently as requested by Plaintiff. (*Id*. at 70-74). Defendant also prescribed Plaintiff Vicodin every four hours as needed for 60 days to treat the ischemic pain associated with his PVD. (*Id*.).

On June 14, 2007, Defendant examined Plaintiff but made no notes regarding the examination. (*Id*. at 77). However, the attending nurse, Teresa Thompson, RN, noted that Plaintiff was complaining of right foot pain and blistering and that the exam revealed toes that were swollen and painful, but normal color and temperature. (*Id*.).

On June 15, 2007, Defendant examined Plaintiff and noted that Plaintiff had "severe PVD", was awaiting surgery, and that Plaintiff reported the pain medications "help[ed]". (Medical Records, at 78). Defendant noted that there was no pulse in Plaintiff's right foot, a small ruptured blister on his right great toe, but no change in color. (*Id*.).

Thereafter, Plaintiff submitted multiple kites and was seen by nurses on June 20, June 22, June 23, and June 25 for complaints of foot pain. Nurses who saw Plaintiff noted his great right toe and foot were black in color (June 22); that he could stand but not bear weight on his right foot (June 23); that his foot was "killing him", had no sensation in his right great toe, and that there was no pedal or post-tibial pulses, there was intact blister on the top of his right foot, and his "2nd toe [was the] only toe [without] black area noted" (June 25). (*Id*. 80-89). Photographs were also taken of Plaintiff's right foot on June 25, 2007. (*Id*. at 88).

Thereafter, on June 26 and 27, Plaintiff was seen again by nurses. On June 26, Plaintiff complained the blister on his foot was draining. (*Id*. at 90). The nurse noted that Plaintiff still had sensation to all his toes but it was diminished at his right great and fourth toes. (*Id*.). There was "no increase in black appearance to toes" and the foot remained warm. (*Id*.). On June 27,

6

the same nurse noted that the blister on Plaintiff's right foot was drying out but two new blisters were present at the base of his great right toe. (*Id*. at 91). Plaintiff noted his foot was "not on fire as much as yesterday". (*Id*.).

On June 27, 2007, Plaintiff's vascular surgery was approved and scheduled for July 6, 2007. (*Id*. at 92-93, 95-96).

On June 28, 2007, Defendant and a nurse examined Plaintiff. The nurse noted surgery was scheduled for July 6, 2007 and that there was capillary refill to bottom of foot but it was slow. (Medical records, at 94). The nurse also noted that "sensation intact to bottom of foot, 2nd thru 5th toes. Great toe w/o sensation." (*Id*.). Defendant set forth in his notes that Plaintiff complained of continued pain and stated that his foot was getting worse and wanted to know when his surgery would occur. (*Id*. at 97). Defendant noted that Plaintiff had "gangrenous tips of 1st, 3rd, 4th and 5th toes" of his right foot, and no distal pulses, and recommended continuing his pain medication. (*Id*.). Defendant's note mistakenly provided that Plaintiff's surgery was scheduled for July 8, 2007. (*Id*.).

On June 29, 2007, Plaintiff was seen by a nurse who noted that he complained his toes hurt more and found that Plaintiff had diminished circulation. (*Id*. at 99). A follow up appointment was made for July 2, 2007. (*Id*.). On July 1, 2007, Plaintiff submitted a kite and was seen by a nurse for pain in his foot and swelling. (*Id*. at 100). The nurse noted that there was "[n]o change in appearance of foot from yesterday." (*Id*. at 101).

On July 2, 2007, Plaintiff was taken to Foote Hospital after he complained of chest pains. Plaintiff was diagnosed there with acute inferior posterior wall myocardial infarction, commonly referred to as a heart attack. (*Id*. at 102-04). Plaintiff's records from Foote Hospital noted that:

Plaintiff's "right leg has chronic ischemic changes"; Plaintiff's right great toe was "gangrenous"; and his foot was "necrotic". (Pl.'s Ex. I, Foote Hospital Medical Records, 4-5, 9-12). The notes also reflected that Plaintiff's vascular surgery was rescheduled but mistakenly state the surgery that had to be rescheduled was an "amputation". (*Id*. at 8).

While at Foote Hospital, Plaintiff "underwent cardiac catheterization and stent placement to the right coronary artery." (Medical Records, at 107). Plaintiff remained at Foote Hospital until July 6, 2007 when he was transferred to Duane Waters Hospital for transition care, and where he remained until being released on parole on July 24, 2007. (Medical Records, at 107; Pl.'s Ex. L, parole verification). The medical notes from Duane Water Hospital provided that Plaintiff's scheduled vascular procedure was postponed because of his "recent myocardial infarction" and noted that Plaintiff's "right foot [wa]s gangrenous" and he was receiving pain medication every eight hours for pain control. (*Id*. at 107-08).

After being paroled, Plaintiff admitted himself to St. Mary's Medical Center in Saginaw, Michigan, and on August 3, 2007, Plaintiff's right lower leg was amputated below the knee.

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), the Court conducts a de novo review of the portions of the Magistrate Judge's Report and Recommendation to which a party has filed "specific written objections" in a timely manner. *Lyons v. Comm'r Soc. Sec.*, 351 F. Supp. 2d 659, 661 (E.D. Mich. 2004). Only those objections that are specific are entitled to a de novo review under the statute. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir.1986). "The parties have the duty to pinpoint those portions of the magistrate's report that the district court must specially consider." *Id*. (internal quotation marks and citation

omitted).  A general objection, or one that merely restates the arguments previously presented, does not sufficiently identify alleged errors on the part of the magistrate judge.  An "objection" that does nothing more than disagree with a magistrate judge's determination, "without explaining the source of the error," is not considered a valid objection.  *Howard v. Sec'y of Health and Human Servs*., 932 F.2d 505, 509 (6th Cir.1991).

Defendant has moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material"  for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."   *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## IV. ANALYSIS

The Magistrate Judge recommended granting Defendant's motion for summary judgment in her Report and Recommendation because she concluded that Plaintiff had failed to present sufficient evidence from which a reasonable jury could find that Defendant was deliberately indifferent to Plaintiff's serious medical needs. Plaintiff has objected the Report and Recommendation on three grounds: (1) the Magistrate Judge ignored his claim that Plaintiff's

suffering of needless and unnecessary pain associated with the gangrene on his right foot is

actionable under the Eighth Amendment; (2) the Magistrate Judge failed to view the evidence

and draw all inferences in Plaintiff's favor as required when reviewing a motion for summary

judgment; and (3) the Magistrate Judge erred in finding that *Johnson v. Karnes*, 98 F.3d 868 (6th

Cir. 2005) was distinguishable from the underlying facts of this action.  As the Court finds

Plaintiff's second and third objections meritorious, it declines to address Plaintiff's first

objection.

      As an initial matter, the Court notes that pursuant to the Eighth Amendment's prohibition

against cruel and unusual punishment, "prisoners have a constitutional right to medical care."

*Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97,

103 (1976)).  This right is violated when officials are "deliberately indifferent" to an inmate's

serious medical needs.  *Id*.  To establish such an Eighth Amendment claim, a plaintiff must

satisfy two components: an objective one and a subjective one.  *See Wilson v. Seiter*, 501 U.S.

294, 300-04 (1991).

      "To satisfy the objective component, the plaintiff must allege that the medical need at

issue is "sufficiently serious."  *Comstock*, 273 F.3d at 702-03 (quoting *Farmer v. Brennan*, 511

U.S. 825, 834 (1994)).  "A medical need is sufficiently serious if the need is 'so obvious that

even a lay person would easily recognize the necessity for a doctor's attention.'"  *Blackmore v.*

*Kalamazoo Cnty.*, 390 F.3d 890, 897 (citation omitted).  "To satisfy the subjective component,

the plaintiff must allege facts which, if true, would show that the official being sued subjectively

perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the

inference, and then disregarded that risk."  *Comstock*, 273 F.3d at 703 (citation omitted).

However, "an official's failure to alleviate a significant risk that *he should have perceived but*

11

*did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. (quoting *Farmer*, 511 U.S. at 837) (emphasis in *Comstock*). Further, while "courts are generally reluctant to second guess medical judgments" when prisoners allege that their treatment was inadequate; "it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Alspaugh v. McConnell*, 643 F.3d 162, 169 (quoting *Westlake v. Lucas*, 537 F.2d at 860 n. 5).

In the instant case, while the Defendant did not contest that Plaintiff alleged a "sufficiently serious" medical issue, the Magistrate Judge concluded that Plaintiff had failed to meet the subjective component of the Eighth Amendment inquiry because he failed to create a genuine issues of material fact regarding whether the Defendant had (1) subjectively perceived facts from which to infer a substantial risk to the prisoner; (2) that he did in fact draw the inference; and (3) then disregarded that risk.

A.      Failure to View the Record in a Light Most Favorable to Plaintiff

Plaintiff now objects to the Report and Recommendation on the basis that the Magistrate Judge erroneously credited the Defendant's version of the facts and failed to draw all reasonable inferences in his favor as a court must when evaluating a motion for summary judgment pursuant to Federal Rules of Civil Procedure 56.  (Obj., at 6-14).  In his Objections, Plaintiff has provided a number of examples that he claims demonstrate the Magistrate Judge failed to view the facts or inferences in a light most favorable to him, the non-moving party.  The Court examines these instances below.

First, the Plaintiff argues that the Magistrate Judge misconstrued Plaintiff's allegations regarding his first meeting with Defendant on June 8, 2007.  In the Report and Recommendation, the Magistrate Judge stated:

12

> Washington further alleges that on June 8, 2007, Jenkins told him, "I don't know
> nothing about no surgery, and I'm not doing shit for you." Even if that allegation
> is true, it does not raise a genuine issue of material fact; the question before the
> Court is whether Jenkins *acted* with deliberate indifference not whether he treated
> Washington with courtesy. With regard to Jenkins' actions, the record shows that
> he requested approval for the vascular procedure the same day as the alleged
> remark, examined Washington multiple times throughout June and provided him
> with pain medication while awaiting surgery.

(R&R, at 19). The Court finds that the Magistrate Judge erred in her analysis by failing to view this evidence in a light most favorable to Plaintiff. Plaintiff clearly alleged that he first met Defendant on June 8, 2007 (a fact that Defendant did not recall but did not deny) and *advised him that the vascular surgeon had instructed him that he needed his vascular surgery as soon as possible.* Plaintiff also alleged that Defendant responded in discourteous manner and told him he would not being doing "shit" for him. Regardless, the Magistrate Judge failed to view this evidence in a light most favorable to Plaintiff because the import of this allegation goes to establishing a genuine issue of material fact regarding whether Defendant was subjectively aware, as of June 8, 2007, that Plaintiff needed emergency surgery.

Indeed, other facts in the record when viewed in a light most favorable to Plaintiff also support finding a genuine issue of material fact as to whether Defendant was subjectively aware that Plaintiff needed emergency surgery in early June 2007. Specifically, Plaintiff's MDOC record which Defendant relied upon in caring for Plaintiff, contained no less than three different references to Plaintiff's need of "urgent" or "emergent" care: (1) Dr. Everette's note regarding her communication with Dr. Cotroneo on May 29, 2007; (2) the denial of Dr. Everette's request for a follow up appointment after the arteriorgram because Plaintiff might need "emergent surgery"; and (3) Dr. Cotroneo's First Form 409 upon which he had written in all caps: URGENT and ASAP. Therefore, the Court finds that Plaintiff has established a genuine issue of

13

material fact regarding whether Defendant was subjectively aware that Plaintiff needed emergency surgery.

Plaintiff also argues that the Magistrate Judge erred when she failed to view Defendant's testimony in a light most favorable to Plaintiff. Specifically, the fact that Defendant confirmed during his deposition that he was aware in early June 2007, "according to the record and according to [his] examination", that Plaintiff "had severe limb ischemia". (Jenkins' Dep. at 57-58). Defendant also acknowledged that he knew that "severe limb ischemia can lead to gangrene". (*Id*. at 58). Defendant went on to admit that Plaintiff did not have gangrene when Defendant first saw Plaintiff in the beginning of June, 2007, but did in fact have gangrenous toes at the end of June, 2007. (*Id*. at 58-59). Accordingly, there is testimony from Defendant that he was aware of Plaintiff's "severe" condition that could lead to gangrene and then observed Plaintiff's condition deteriorate and worsen until Plaintiff did in fact have gangrene. Defendant also submitted a contradictory statement made under penalty of perjury that when he first saw Plaintiff he believed Plaintiff's foot "had some collateral flow to the foot and was not ischemic, and therefore it was appropriate to wait for surgery as requested by 7/6/2007." (Def.'s Ex. B, Jenkins' Cert. at ¶ 9). In the Report and Recommendation, the Magistrate Judge erroneously relied upon Defendant's contradictory statement that he did not believe Plaintiff's foot was ischemic in early June 2007 and the medical experts' opinions to conclude that Plaintiff failed to show that Defendant actually perceived a substantial risk to Plaintiff and disregarded that risk. (R&R, at 18).

The Court finds that Defendant's clear testimony that he was aware that Plaintiff was suffering from "severe ischemia" in early June 2007, and was similarly aware that such a condition can lead to gangrene, coupled with the fact that Plaintiff's condition and pain

progressively worsened throughout the month of June 2007 under Defendant's supervision, creates a genuine issues of material fact regarding whether (1) Defendant did in fact draw the inference that failing to schedule emergency surgery constituted a substantial risk to Plaintiff, and (2) then disregarded that risk.

In sum, the Court finds that Plaintiff has set forth sufficient evidence to create a genuine issue of material fact regarding whether Defendant was deliberately indifferent to Plaintiff's serious medical need.

      B.     *Johnson v. Karnes*

The conclusions set forth above dovetail with Plaintiff's objection that the Magistrate Judge erred in finding that *Johnson v. Karnes*, 398 F.3d 868 (6th Cir. 2005) was distinguishable from the facts of this case.

In *Johnson*, the plaintiff was taken into custody shortly after severing all the tendons in his dominant hand. *Id*. at 870-71. The plaintiff was in custody for the next 31 days but spoke to the defendant doctor only once, his wound was not checked on a regular basis, and plaintiff's bandages were changed only once. *Id*. at 871. The Sixth Circuit held that the medical need was obvious and concluded that there were genuine issues of material fact regarding whether the defendant doctor subjectively perceived a risk of harm and whether he then disregarded that risk. *Id*. 875-76. The Sixth Circuit explained that a reasonable juror could find that the defendant doctor was being untruthful and was in fact aware of plaintiff's severed tendons based on his testimony that it was policy for him to be contacted about kites reflecting urgent situations and plaintiff had submitted kites complaining of an urgent medical issue, and he had admittedly seen the plaintiff at least once. *Id*. at 876. The Sixth Circuit also found that the medical evidence demonstrated that it was "common medical knowledge" that tendons had to be repaired quickly

15

or the injury could be come irreparable.  That medical knowledge combined with the fact that the

defendant doctor never scheduled plaintiff for surgery, the plaintiff's testimony regarding his

problems receiving treatment while in custody, and the plaintiff's medical forms that "very

explicitly stat[ed] his need for prompt surgery" was sufficient to create a genuine issue of fact

over whether the defendant doctor in fact disregarded the risk associated with the plaintiff's

severed tendons.  *Id*. at 875-76.

The Magistrate Judge distinguished *Johnson* on the fact that in *Johnson* it was "common

knowledge" that severed tendons must be repaired in a timely manner because over time the

tendons could become irreparable as compared to the medical issue in the present case, where

"three of the four experts who reviewed this case did not believe that it was evident that

Washington's vascular procedure should have been scheduled earlier than July 6."  (R&R, at

20).

Plaintiff argues that the relevant portion of *Johnson* is the Sixth Circuit's conclusion that:

> Based on Dr. Spagna's testimony about the way medical forms are processed, a
> reasonable jury could conclude that Dr. Spagna was not being truthful or accurate
> when he stated that he had not seen the medical request forms and did not know
> that Johnson's tendons were in fact severed.

*Johnson*, 398 F.3d at 876.  Plaintiff avers that like *Johnson*, a reasonable juror in this case could

conclude that Defendant is being untruthful in his testimony that nothing in Plaintiff's chart

suggested that he needed urgent treatment.

The Court agrees.  As the Sixth Circuit noted in *Johnson*, the burden to establish the

subjective component is "onerous", but it is "subject to proof by 'the usual ways.'" 398 F.3d at

875 (citation omitted).  "The subjective knowledge standard does not allow a prison official [to]

escape liability if the evidence showed that he merely refused to verify underlying facts that he

16

strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Id.* (citing *Comstock*, 273 F.3d at 703) (internal quotation marks removed)

Here, Defendant narrowly argues that the notations indicating a need for urgent treatment only refer to Plaintiff's need for an arteriogram. However, the Court must take the record in a light most favorable to Plaintiff, and as noted above, viewing the record in a light most favorable to Plaintiff, the medical chart Defendant relied upon contained multiple references to Plaintiff's need for "urgent" medical care. Specifically, the medical record indicated repeatedly that Plaintiff's need for an arteriogram was "URGENT" and needed "ASAP", and included a denial for a follow up appointment based on the fact the likelihood that Plaintiff would need "emergent" surgery after the arteriogram.

The Court finds that Defendant's testimony acknowledging Plaintiff's severe limb ischemia and obvious deterioration of Plaintiff's condition as documented by Plaintiff's nurses, in addition to multiple notations of the need of "urgent" or "emergent" care in Plaintiff' medical chart, could lead a reasonable juror to conclude that Defendant's reliance on a blank "TIMELINE" section in the Second Form 409 or Defendant's failure to call Dr. Cotroneo to confirm the surgery was "routine" was merely Defendant's refusal to "verify underlying facts that he strongly suspected to be true" or failure to "confirm inferences of risk that he strongly suspected to exist". *Johnson*, 398 F.3d at 875 (citation omitted). However, like the defendant in *Johnson*, Defendant cannot "escape liability" under the subjective standard by simply refusing to acknowledge facts that he knew or strongly suspected to be true. Additionally, these facts could reasonably lead a juror to conclude that Defendant was being untruthful when he testified that nothing in Plaintiff's chart suggested that Plaintiff needed emergency surgery.

17

Accordingly, the Court finds the *Johnson* analysis is persuasive and supports the conclusion that Plaintiff has evidenced a general issue of material fact regarding whether Defendant was deliberately indifferent to his serious medical need by failing to schedule his vascular surgery urgently.

C.    Proximate Cause

The Court notes that the Magistrate Judge did not reach Defendant's alternative argument that Plaintiff's claim fails because he cannot show by a preponderance of the evidence that Defendant's actions were the proximate cause of his harms. As the Court concludes that Plaintiff has evidenced a genuine issue of fact regarding Defendant's deliberate indifference to his medical needs in violation of the Eighth Amendment, the Court will address Defendant's alternative argument.

Defendant argues in his Motion for Summary Judgment that Plaintiff's Eighth Amendment claim must fail because there is insufficient evidence in the record for a jury to conclude that Defendant's acts were the proximate cause of any harm to Plaintiff. (Def.'s Br. at 29-35). In short, Defendant argues that Plaintiff's July 2, 2007 heart attack was a completely unforeseen, intervening and superceding event that constituted the "but for" cause of Plaintiff's amputation. Defendant relies upon his medical experts to support his claim that "but for" Plaintiff's heart attack, Plaintiff would have received his vascular surgery on July 6, 2007 and his leg would not have been amputated. Plaintiff argues in response that his medical expert, Dr. Gradman, opined that Plaintiff's heart attack was likely precipitated by Plaintiff's "extensive symptomatic severe peripheral vascular disease and the stress and anxiety daily watch[ing] his foot necrose" and was therefore not an unforeseeable event. (Pl.'s Ex. O, Gradman Rule 26 Report, at 13-14). Plaintiff also argues that whether Plaintiff's heart attack was a foreseeable

18

event due to his medical history and the fact he was suffering extreme pain and watching his toes turn black with gangrene is an issue of fact properly submitted to a jury.

First, the Court notes that Defendant did not argue in its motion for summary judgment that Plaintiff had failed to evidence he had a "serious medical need", i.e. the objective standard of the Eighth Amendment inquiry. Rather, Defendant argued that Plaintiff could not establish the subjective component of the inquiry: that Defendant had consciously disregarded a known serious risk of substantial harm to Plaintiff. This distinction is relevant to Defendant's alternative argument regarding whether Defendant was the proximate cause of the harm to Plaintiff because such an argument is subsumed by this inquiry.

The Sixth Circuit has explained there are two ways to establish a "serious medical need":

> For obvious medical needs left completely untreated, "the delay alone in providing medical care creates a substantial risk of serious harm." [*Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004) (citation omitted)]. By contrast, where a " 'deliberate indifference' claim is based on a prison's failure to treat a condition adequately" or on "a determination by medical personnel that medical treatment was unnecessary," a plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Blackmore*, 390 F.3d at 897–98 (emphasis added) (citing *Napier v. Madison Cnty. Ky.*, 238 F.3d 739, 742 (6th Cir.2001)); *see also Blosser v. Gilbert*, 422 Fed.Appx. 453, 460 (6th Cir.2011).

*Cobbs v. Pramstaller*, 475 F. App'x 575, 580 (6th Cir. 2012). Further, "[w]here the seriousness of a prisoner's needs for medical are is obvious even to a lay person, the constitutional violation may arise. This violation is not premised upon the 'detrimental effect' of delay, but rather that the delay alone in providing medical care creates a substantial risk of serious harm." *Owensby v. City of Cincinnati*, 414 F.3d 596, 604 (citing *Blackmore*, 390 F.3d at 899)). In those types of cases, "the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition." *Id.*

19

In the present case, Plaintiff argues that he was denied the right to adequate medical care under the Eighth Amendment due to Defendant's deliberate indifference to his need for urgent surgery.  Plaintiff alleges that this delay in treatment caused Plaintiff harm, including pain and suffering through the month of June as his toes turned black, and also the eventual amputation of his leg in August.  To the extent that Plaintiff's medical condition was not obvious to a layperson where he was clearly diagnosed on June 7, 2007 with an occlusion in his right leg and "Severe PVD [right] leg" that required surgery; Plaintiff has also set forth sufficient medical evidence to establish a genuine issue of material fact regarding "the detrimental effect of the delay in medical treatment" through the medical records documenting his ongoing pain, the onset of gangrene and necrosis of his toes, and his medical expert's opinions that his leg would not have been saved by vascular surgery on July 6, 2007 and that his heart attack was not unforeseeable.  Put another way, Plaintiff has established at least a genuine issue of material fact regarding the "link" from Defendant's actions and his injuries.  *See Clark-Murphy v. Foreback*, 439 F.3d 280 (6th Cir. 2006) (rejecting the defendant's argument that their actions were not the "proximate cause" of the plaintiff's death, holding: "the claimant need only demonstrate a link between each defendant's misconduct and Clark's *injury*, which may include his death as well as 'the pain and suffering,' [] that preceded his death." (emphasis in original)) (citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1153 (6th Cir. 1991), *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)).

Accordingly, the Court finds that Defendant's argument regarding proximate cause is more correctly addressed in the context of whether Plaintiff has established that he suffered a "serious medical need".  The Court further concludes that Plaintiff has set forth sufficient medical evidence in the record to demonstrate at least a genuine issue of material fact regarding the "detrimental effect" of not scheduling Plaintiff's surgery emergently (which could include

20

Plaintiff's pain, suffering, and/or amputation of his right leg).  Additionally, the Court notes that even if it was appropriate to assess Defendant's proximate cause argument separately from the Eighth Amendment inquiry, the issue of proximate cause is one for the jury where there are competing medical opinions in the record.  *See Toth v. Yoder Co.*, 749 F.2d 1190, 1197 (6th Cir. 1984) ("Proximate causation, or the lack of it, is generally a question of fact....").

## VI. CONCLUSION

For all these reasons the Court GRANTS Plaintiff's Objections (ECF No. 126) and REJECTS the Magistrate Judge's Report and Recommendation (ECF No. 125).  The Court also DENIES Defendant's Motion for Summary Judgment (ECF No. 114).

IT IS SO ORDERED.


s/Paul D. Borman                                    
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 30, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 30, 2015.


s/Deborah Tofil                                    
Case Manager

21